# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

N⁰ 11-CV-2913 (JFB) (WDW)
_____

FEREDUN ZARRINGHALAM,

Plaintiff,

VERSUS

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 1500 WELFARE FUND,

Defendant.

_____

MEMORANDUM AND ORDER
November 30, 2012
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Feredun Zarringhalam ("plaintiff" or "Zarringhalam") brought this action in the District Court of the County of Nassau, First District, against United Food and Commercial Workers International Union Local 1500 Welfare Fund ("defendant" or "Fund"). Defendant timely removed the action to this Court. Now before the Court are the parties' cross-motions for summary judgment. The parties' arguments are as follows.

Plaintiff, a participant in a group welfare benefits plan (the "Plan") maintained by defendant, argues that defendant breached its contractual obligation to pay for plaintiff's medical expenses that plaintiff incurred from injuries sustained during a tripping accident. Defendant subsequently moved for summary judgment, raising three challenges to plaintiff's claim: (1) plaintiff's breach-of-contract action sounds in state law and is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*; (2) plaintiff failed to exhaust the Plan's administrative remedies, making dismissal of his claim warranted; and (3) the Fund's trustees' discretionary decision concerning the allotment of benefits to plaintiff was neither arbitrary nor capricious because the Plan's terms expressly state that payment for third party-caused injuries is not available under the Plan unless the injured participant

executes a subrogation agreement, which plaintiff never did.

Plaintiff cross-moved for summary judgment, asserting the following arguments: (1) even if plaintiff's claims are preempted by ERISA, such preemption does not require a dismissal of his breach of contract claim; (2) plaintiff's action should be evaluated under state or federal common law, regardless of ERISA's applicability; (3) plaintiff was not required to exhaust the Fund's administrative procedures because no technical denial of benefits occurred in his case, and thus, the Fund's appeal process requirements were never triggered; (4) the lack of a subrogation agreement requirement under ERISA negates the enforceability of the Plan's subrogation provision; and (5) the Fund breached its contractual agreement with plaintiff.

After careful consideration of the parties' arguments, and for the reasons set forth herein, the Court grants summary judgment in favor of the defendant. It accordingly denies plaintiff's cross-motion for summary judgment.

## I. FACTS

The Court derives the facts below from the parties' affidavits and exhibits, and from defendant's Rule 56.1 Statement of Facts (incorporated by the plaintiff into his cross-motion for summary judgment). A court considering a motion for summary judgment shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where defendant's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

### A. The Fund

The Fund was established by an Agreement and Declaration of Trust (the "Trust Agreement"); its purpose is to provide welfare benefits to Plan participants by virtue of their employment with contributors to the Fund. (Def.'s Statement of Material Facts Pursuant to Rule 56.1 ("Def.'s 56.1") ¶¶ 1-3.) The Fund provides an "employee benefit plan" governed by ERISA.[1] The Fund's assets are derived from two main sources of income. The first and predominant means is the aforementioned employer contributions made pursuant to collective bargaining agreements with a labor organization, specifically, United Food and Commercial Workers Local 1500 (the "Union"). (*Id.* ¶¶ 1-2.) The second source of income consists of investing contributions not immediately needed for the payment of benefits or administrative costs. (*Id.* ¶ 2.) Employees are not responsible for providing income or cost of coverage to the Fund. (Maria Maloney Affidavit ("Maloney Aff.") ¶¶ 6-7.)

A Board of Trustees ("Board" or "Trustees"), equally composed of Union and contributing employers' appointees, administers the Fund in accordance with § 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5). (Def.'s 56.1 ¶ 3.) Pursuant to section 4, Article V of the Trust Agreement, these Trustees "have complete

---

[1] The Fund's plans fall within the meaning of an employee welfare benefit plan as defined under Section 3(1) of ERISA, 29 U.S.C. § 1002(1) (defining "employee welfare plan" as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries . . . benefits").

discretionary authority to interpret and construe all terms and provisions of . . . the Plan . . . including, but not limited to questions relating to eligibility, [and] entitlement to benefits." (*Id.*)

The Board establishes and maintains several benefit plans, one for full-time employees and two for part-time employees. (*Id.* ¶ 5.) These benefit plans are self-insured, *i.e.*, benefit claims and administrative expenses paid by the Fund are done so out of available Fund assets. (*Id.* ¶ 4.) The Fund does not purchase insurance to cover those benefits it becomes obligated to pay, and bears any risk of loss on such claims alone. (*Id.*) All of the Fund's benefit plans contain provisions excluding coverage for injuries or illnesses for which a third party is liable, to be addressed in greater detail below.

B. The Special Part-Time Plan

The benefit plan that is the focus of this dispute is the "Special Part-time Plan" in which plaintiff participated. (Def.'s 56.1 ¶ 5.) The terms of this particular Plan are set forth in the Fund's "Summary Plan Description" ("SPD"), a copy of which is provided to each new part-time employee working for a contributing employer approximately one month before that employee's eligibility for Plan participation begins. (*Id.*) Updated SPDs also are sent to all part-time Plan participants when ERISA so requires.[2] (Maloney Aff. ¶ 10.) The SPD sets forth the Fund's appeal procedures for employees. (Def.'s 56.1 ¶ 10.) Key provisions of the SPD for purposes of this action are set forth as follows.

The SPD establishes that the Trustees have authority to administer the different benefit plans. It states: "Notwithstanding any other provision of this Plan, the Board of Trustees is responsible for interpreting the Plan and for making determinations under the Plan." (Maloney Aff. Ex. B, at 59.)

The SPD also addresses subrogation procedures should a participant's injuries arise from a third party's actions. This section of the SPD, entitled "Involving Third-Party Liability," states: "Under the terms of the Plan, no benefits are payable if a third party may be liable for your medical expenses." (*Id.* at 69.) It further provides that "[t]he Plan may pay such expenses provided that you agree, in writing, to reimburse the Plan, in full, from any settlement, judgment, or other payment that you obtain from the liable third party." (*Id.*) The SPD states that "[n]o benefits will be provided unless you and your attorney (if any) sign the [subrogation] form." (*Id.* at 70.) In short, the SPD makes clear that a plan participant may not recover twice for one injury, *i.e.*, one time from the third party-cause of the injury, and one time from the Fund.

C. Zarringhalam's Injury and Receipt of his Claims

On March 4, 2009, Zarringhalam tripped on a raised sidewalk flag, allegedly sustaining injuries to his wrist. (Def.'s 56.1 ¶ 14; Maloney Aff. Ex. G.) Zarringhalam sent a claim for his physical injury to Maloney Associates, Inc. ("Maloney Associates"), a third-party administrative service provider to the Fund, on May 7, 11, 13, 15, 20, 26, and June 8 and 22, 2009. (Def.'s 56.1 ¶ 12.) On May 19, June 9, 18, 25, and July 16, 2009, Maloney Associates sent Explanations of Benefits ("EOBs") to Zarringhalam. (*Id.*) The EOBs listed

---

[2] The record shows that the last updated SPD was sent to Fund participants in approximately March 2004, very soon after plaintiff became a participant in the Fund. (Maloney Aff. ¶ 10.)

3

plaintiff's claim as "pending;" printed on the reverse side of the EOBs was a description of the Fund's appeal procedures. (*Id.*) Each of the EOBs requested additional information as to Zarringhalam's claim, stating:

> Before we can consider these charges, we will need to know how, when and where this injury occurred. Please write a brief explanation about your injury and send it to Maloney Associates, Inc., 211 Broadway, Lynbrook, NY 11563. Be sure to include your name, identification number and an answer to the questions above, as specified in your Summary Plan Description.

(Def.'s 56.1 ¶ 12; Maloney Aff. Ex. C.)

During this same period, Maloney Associates had one of its benefit analysts send a letter to Zarringhalam informing him that processing of his claims would require additional information concerning the how, when, and where as to his injuries. (Def.'s 56.1 ¶ 13.) This letter initially was sent on May 12, 2009, (Maloney Aff. Ex. D), with a subsequent copy stamped "Second Request" being sent on July 3, 2009, (Maloney Aff. Ex. E), and an additional copy stamped "Third Request" being sent on August 20, 2009, (Maloney Aff. Ex. F). These letters further clarified that processing of plaintiff's claim remained pending until receipt of the specified information. (Def.'s 56.1 ¶ 13.) Maloney Associates did not receive a response from plaintiff concerning the EOBs or letters. (*Id.* ¶ 17.)

D. Zarringhalam's Response to the EOBs

On August 27, 2009, attorney Thomas J. Stock informed Maloney Associates that his firm was representing plaintiff. (Def.'s 56.1 ¶ 14; Maloney Aff. Ex. G.) His letter included the following information as to plaintiff's injury: "Zarringhalam was injured on March 4, 2009 in front of 4361 Bedford Avenue, Brooklyn, New York when he tripped on a raised sidewalk flag." (Def.'s 56.1 ¶ 14; Maloney Aff. Ex. G.) The letter concluded with a demand for payment of plaintiff's outstanding claim. (Def.'s 56.1 ¶ 14; Maloney Aff. Ex. G.)

Maloney Associates responded on September 4, 2009, with a questionnaire seeking additional information concerning plaintiff's claim. (Def.'s 56.1 ¶ 15; Maloney Aff. Ex. H.) The letter included a copy of the Fund's standard form subrogation agreement. (Def.'s 56.1 ¶ 15; Maloney Aff. Ex. H.) The letter also stated:

> If a third person is considered to be responsible for the sickness or injury which gave rise to the charges submitted . . . the Plan permits us to make payment if you . . . and your attorney sign a reimbursement agreement promising to pay the Fund back when and if you receive payment from or on behalf of the responsible party.

(Maloney Aff. Ex. H.)

A copy of this letter was again sent to plaintiff on November 19, 2010, stamped "Second Request," (Def.'s 56.1 ¶ 15; Maloney Aff. Ex. I), and again on February 15, 2011, stamped "Third Request," (Def.'s 56.1 ¶ 15; Maloney Aff. Ex. J.) Maloney Associates' Luba M. Gonzalez, a Claims Supervisor and Legal Assistant for the Company, was responsible for sending the questionnaire and various copies of the letter to Zarringhalam. (Def.'s 56.1 ¶ 15.)

According to Maloney Associates' digital phone logs, Gonzalez also engaged in a telephone conversation with plaintiff on

September 9, 2009, before the sending of the Second and Third Requests. (*Id.* ¶ 16.) The log sheds the following light on the content of their conversation: "member re receipt of TF. Wanted to know if his atty needs to sign. Yes. He will sign, answer questions and forward to his atty. LG." (*Id.*)[3]

Maloney Associates never received an executed copy of the Fund's subrogation agreement from either plaintiff or his attorney. Additionally, the record does not show that Zarringhalam ever requested a waiver of the Fund's subrogation requirement, nor does the record show that he appealed the Fund's decision to withhold benefits until he had officially signed a subrogation agreement. (Maloney Aff. ¶ 18.)

II. PROCEDURAL HISTORY

On April 25, 2011, plaintiff filed the instant action against the Fund in New York State District Court for the District of Nassau County. The Fund removed the action to this Court on June 16, 2011. On April 25, 2012, the Fund moved for summary judgment. On May 23, 2012, Zarringhalam opposed the Fund's motion and cross-moved for summary judgment. The Fund submitted a brief opposing plaintiff's cross-motion and in further support of the Fund's motion on June 8, 2012. Oral argument took place on September 13, 2012. This matter is fully submitted and the Court has considered all of the party's submissions.

III. STANDARD OF REVIEW

A. Summary Judgment

The standard for summary judgment is well-established. Federal Rule of Civil Procedure 56(a) provides that a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating "if the evidence is such that a reasonable jury could return a verdict for the

---

[3] According to the Maloney affidavit, plaintiff produced a September 14, 2009 letter that he allegedly sent to Gonzalez in his initial disclosures. (Maloney Aff. ¶ 17.) The letter stated that plaintiff "ha[s] a problem" with signing the subrogation agreement, and it requested a copy of the Plan documents. (*Id.*) Maloney Associates contends that it has no record of ever receiving this letter, and notes that plaintiff has not provided proof of any such receipt by Maloney Associates.

nonmoving party," summary judgment is not warranted).

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court made clear in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars' showing that a trial is needed." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). In other words, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *Bellsouth Telecomms., Inc. v. W. R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33) (internal quotation mark omitted).

## IV. DISCUSSION

### A. ERISA Preemption

Defendant contends that plaintiff's breach of contract claim is a question of state law that is preempted by section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). For this reason, defendant asserts that this Court should dismiss plaintiff's state law claim and review his allegations under ERISA. As set forth below, the Court agrees.

1. Legal Standard

ERISA was enacted to "'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)) (alteration in original). Its main objective "is to provide a uniform regulatory regime over employee benefit plans." *Id.* The statute does so through its broad preemption provisions, specifically, section 514, 29 U.S.C. § 1144, which safeguards the exclusive federal domain of employee benefit plan regulation. *See Aetna Health Inc.*, 542 U.S. at 208; *see also Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981). Specifically, section 514 of ERISA states that, unless so limited, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a).

Section 502(a)(1)(B) serves as ERISA's main enforcement tool in ensuring a uniform federal scheme. The Supreme Court has explained that "the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987). The

6

Supreme Court has noted how "the inclusion of certain remedies and the exclusion of others under [§ 502's] federal scheme . . . 'provide[s] strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Id.* (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)). It likewise has acknowledged that "the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.*

Section 502(a)(1)(B) of ERISA provides:

> A civil action may be brought – (1) by a participant or beneficiary - . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

The statute's express language establishes ERISA's preemptive force in suits concerning benefits under self-insured employee welfare benefit plans. *See*, *e.g.*, *Aetna Health Inc.*, 542 U.S. at 210 ("[I]f an individual . . . could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)."); *Metro. Life Ins. v. Taylor*, 481 U.S. 58, 65-66 (1987) (noting that section 502(a)(1)(B) of ERISA contains "extraordinary pre-emptive power" that "converts an ordinary state common law complaint into one stating a federal claim," making "causes of action within the scope of . . . § 502(a) . . . removable to federal court").

2. Application

The Fund's Plan is an employee welfare benefit plan within the meaning of section 3(1) of ERISA, 29 U.S.C. § 1002(1). *See supra* n.1. Zarringhalam claims he "entered into an insurance contract with the defendant" pursuant to which the Fund "was to indemnify the plaintiff for his medical expenses." (Compl. ¶ 2.) Plaintiff asserts defendant "breached said contract by failing to pay for . . . medical services in accordance with said contract," (*id.* ¶ 4), and seeks damages for the same, (*id.* ¶ 6.) Although plaintiff does not specifically state his cause of action as such in his Complaint, his action sounds in state breach of contract law.

The law is clear that ERISA preempts state law breach of contract claims seeking the recovery of benefits due under an employee welfare benefit plan because they "relate to" those plans within the meaning of section 514. *See* 29 U.S.C. § 1144(a) (stating ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan" (emphasis added)); *Morlino v. Staten Island Univ. Hosp.*, 173 F.3d 845, 845 (2d Cir. 1999) (holding ERISA preempted plaintiff's state law claims, including breach of contract); *Kolasinski v. Cigna Healthplan of CT, Inc.*, 163 F.3d 148, 149 (2d Cir. 1998) (per curiam) (same); *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 591 (2d Cir. 1993) (same). Because plaintiff seeks a recovery of benefits, his claim "relate[s] to" an "employee welfare benefit plan" covered by ERISA, and thus, is preempted.

7

Plaintiff attempts to sidestep ERISA's preemptive power, arguing that because ERISA does not directly target subrogation disputes or provide a remedy for his particular claim, ERISA preemption is not in play. (Thomas J. Stock Affirmation ("Stock Affirm.") ¶ 7.) The Court disagrees with plaintiff's contention that the issue here as to the signing of the subrogation agreement somehow nullifies the preemptive effect of ERISA. It is well-settled that ERISA's preemptive power also extends to subrogation disputes arising from ERISA-covered benefit plans. *See*, *e.g.*, *FMC Corp. v. Holliday*, 498 U.S. 52, 60-65 (1990) (holding that ERISA preempted a state anti-subrogation law, the latter of which prohibited an employee welfare benefit plan from requiring reimbursement from a participant that already had recovered from a third party, and noting that preemption served "to ensure that benefit plans will be governed by only a single set of regulations").

Undeterred, plaintiff argues that, even if ERISA preempts his claim, this Court should apply federal common law that adopts New York state law. (Stock Affirm. ¶¶ 11, 13.) The Court disagrees.

Courts have recognized that federal common law may only be applied to claims arising under ERISA when the statutory text offers no guidance. *See Grabois v. Jones*, 89 F.3d 97, 101 (2d Cir. 1996) ("[I]f the question is one of federal law, it must be resolved either by the ERISA statute itself or, in the absence of a statutory provision, by federal common law."); *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 14 (2d Cir. 1993) (similar); *see also Muse v. Int'l Bus. Machs. Corp.*, 103 F.3d 490, 495 (6th Cir. 1996) (stating "federal common law is developed under ERISA only in those instances in which ERISA is silent or ambiguous"); *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir. 1993) ("Courts may develop . . . federal common law only where ERISA itself 'does not expressly address the issue before the court.'" (quoting *Nachwalter v. Christie*, 805 F.2d 956, 959 (11th Cir. 1986))). Moreover, courts may only adopt state law as federal common law when ERISA "leaves an issue open and no federal common law exists to address it." *Grabois*, 89 F.3d at 101; *Krishna*, 7 F.3d at 14 ("In developing federal common law, . . . resort may be had to state law in a proper case.").

An air of caution abounds to any such application, however: courts may not use federal common law to rewrite, displace, or otherwise alter a federal statute's explicit language. *See Krishna*, 7 F.3d at 14 (citing *Nachwalter*, 805 F.2d at 959-60). Thus, should this Court apply federal common law to this action, it may not supplant ERISA's text or change the specific terms of the contested ERISA-governed employee benefit plan. *Id.; Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir. 1992) ("[R]esort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, discourage employers from implementing plans governed by ERISA, or threaten to override the explicit terms of an established ERISA benefit plan.").

As previously set forth, ERISA's statutory text – specifically, section 502 – expressly covers plaintiff's claim for benefits under the Plan. *See* 29 U.S.C. § 1132(a)(1)(B) (permitting an employee welfare benefit plan participant to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"). Stated differently, ERISA is neither silent

nor ambiguous as to the nature of plaintiff's claim. *See generally Grabois*, 89 F.3d at 101; *Thomason*, 9 F.3d at 647. Thus, because ERISA explicitly addresses plaintiff's claim, this Court need not apply federal common law to this dispute.

The Court similarly rejects plaintiff's request, relying on *Sargeant v. Int'l Union of Operating Eng'rs.*, 746 F. Supp. 241 (D. Conn. 1990), that it apply a federal common law remedy adopting state law. For the following reasons, *Sargeant* does not advance plaintiff's case.

First, although plaintiff is correct that the *Sargeant* court found federal common law (applying state law) to be applicable, *Sargeant* is distinguishable from the facts presented here. In *Sargeant*, a plaintiff sought declaration that she was not required to reimburse, either in part or in full, her employer's health plan for medical expenses it covered for third party-caused injuries she sustained. *Id.* at 244. Notably, however, the *Sargeant* plaintiff had executed a subrogation agreement with her employer's health plan. *Id.* at 243, 246. Thus, plaintiff's dispute directly concerned her subrogation rights under the plan, an issue which the *Sargeant* court deemed a "non-core ERISA matter[]." *Id.* at 245. Here, plaintiff's dispute concerns the alleged improper withholding of payment for his medical claims, a matter that directly falls under section 502 of ERISA.

Second, subsequent to the district court's determination in *Sargeant*, the Supreme Court issued its decision in *FMC Corp. v. Holliday*, 498 U.S. 52 (1990). In that case, the Supreme Court expressly rejected the argument that subrogation disputes concerning ERISA-covered, self-insured employee welfare benefit plans could be resolved under state law, noting its concern of "frustrat[ing] plan administrators' continuing obligation to calculate uniform benefit levels nationwide," and "complicat[ing] the administration of nationwide plans, producing inefficiencies that employers might offset with decreased benefits." *Id.* at 60; *see also Preze v. Bd. of Trs., Pipefitters Welfare Fund Local 597*, No. 91 C 6124, 1992 WL 38398, at *4 (N.D. Ill. Feb. 24, 1992) *aff'd*, 5 F.3d 272 (7th Cir. 1993) ("The Congressional intent of ERISA would be subverted if each state were permitted to apply its own law relating to subrogation as the federal common law."). Because plaintiff's request to apply federal common law adopting state law runs the risk of creating this very "patchwork scheme" advised against by the Supreme Court, *FMC Corp.*, 498 U.S. at 60, this Court rejects plaintiff's argument to apply state subrogation law to the matter at hand.[4]

Thus, for the foregoing reasons, this Court holds that plaintiff's claim is preempted by ERISA and that, because section 502 of ERISA directly applies to plaintiff's claim, application of federal common law – or federal common law adopting state law – is not warranted.[5]

---

[4] Indeed, this concern of creating a "patchwork scheme" is visible here on a smaller scale as the Fund applies to individuals living in New York, New Jersey, and Connecticut. (Def.'s Mem. in Opp'n. to Cross Mot. for Summ. J. and in support of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 7 (June 8, 2012).) Adopting plaintiff's position could expose the Fund to three different states' subrogation laws, countering the Supreme Court's goal of establishing a uniform benefit system.

[5] For the reasons set forth *supra*, the Court similarly rejects plaintiff's breach of contract claim raised in his cross-motion for summary judgment. (Stock Affirm. ¶ 38.)

### B. Exhaustion of Administrative Remedies

Having established that plaintiff's ERISA-covered action was properly removed to this Court, defendant next seeks to remove the action altogether from the Court's consideration. Specifically, defendant argues that summary judgment is warranted because the uncontroverted evidence demonstrates that Zarringhalam was properly notified of the Fund's administrative remedies, and he failed to properly exhaust its appeals process.

#### 1. Legal Standard

The requirement of exhaustion of administrative remedies in ERISA cases is well-settled. *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006); *Kennedy*, 989 F.2d at 594; *see also Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989.) The Second Circuit has specifically acknowledged the rationales supporting this exhaustion requirement in ERISA cases:

> The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*.

*Kennedy*, 989 F.2d at 594 (quoting *Denton v. First Nat'l Bank of Waco, Texas*, 765 F.2d 1295, 1300 (5th Cir.), *reh'g denied*, 772 F.2d 904 (5th Cir. 1985).)

ERISA requires employee benefit plans to provide an internal review procedure for arising plan participant disputes. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(b). A plan participant must exhaust such procedures before resorting to the courts. S*ee Klotz v. Xerox Corp.*, 332 F. App'x 668, 669 (2d Cir. 2009) (recognizing exhaustion requirement in ERISA cases); *Leonelli*, 887 F.2d at 1199 (same); *Shamoun v. Bd. of Trs.*, 357 F. Supp. 2d 598, 602 (E.D.N.Y. 2005) ("A claimant's exhaustion of administrative remedies provided under a benefit plan is a prerequisite to filing an action which arises under ERISA.") This requirement remains firm, even if a plan participant is unaware of that plan's administrative procedures. *Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 134 (2d Cir. 2001). A failure to exhaust administrative remedies provides grounds for dismissal or summary judgment in favor of the opposing party. *See*, *e.g.*, *Quigley v. Citigroup Supplemental Plan for Shearson Transfers*, N. 09 Civ. 8944(PGG), 2011 WL 1213218, at *7 (S.D.N.Y. Mar. 29, 2011) (citing cases). Moreover, waiver of this exhaustion requirement may only be granted where a participant makes a "'clear and positive showing' that pursuing available administrative remedies would be futile, [and that] the purposes behind the requirement of exhaustion [would] no longer [be] served . . . ." *Kennedy*, 989 F.2d at 594 (quoting *Fizer v. Safeway Stores, Inc.*, 586 F.2d 182, 183 (10th Cir. 1978)).

#### 2. Application

The employee welfare benefit plan at issue contains a formal administrative review process. (Maloney Aff. Ex. B, at 57.) Specifically, Part C of the SPD, entitled "Claim Appeal Procedures," sets forth the appeals process for participants seeking review of a Fund decision, whether it be a denial of benefits or "an adverse decision of

a post service claim." (*Id.*) The SPD requires that a written appeal include the following language so that the Fund may distinguish between formal appeals and general inquiries:

> I AM WRITING IN ORDER TO APPEAL THE TRUSTEE'S DENIAL OF BENEFITS FOR _____, DATED _____.

(*Id.*)

The SPD additionally advises that "[y]our appeal should state the reasons why you believe you are entitled to the benefit you claim and you may submit additional information relating to the claim should you believe it is pertinent to your position." (*Id.*) The SPD instructs participants to send "[a]ny such appeal . . . to the attention of the Board of Trustees" and to mail it to the Fund Office. (*Id.*) Where the Fund's Trustees affirm a denial of benefits, the SPD authorizes participants to bring a civil action against the Fund pursuant to section 502(a) of ERISA. (*Id.* at 58.)

The uncontroverted evidence in the record shows that plaintiff did not exhaust the administrative remedies available to him under the Fund's SPD. In brief: plaintiff submitted several claims for benefits; the Fund, via Maloney Associates, sent plaintiff EOBs for these claims, each marked "pending" and requesting additional information as to the nature and cause of plaintiff's alleged injury; plaintiff's counsel responded to these inquiries with an August 27, 2009 letter, stating simply that plaintiff was injured when he tripped on a raised sidewalk flag and demanding payment of claims; Maloney Associates responded by sending plaintiff, on September 4, 2009, a questionnaire requesting additional information as to plaintiff's claim, as well as a standard form subrogation agreement; Maloney Associates re-sent these materials two more times and participated in a phone conversation with plaintiff on September 9, 2009; plaintiff never executed the standard form subrogation agreement, nor did he file a formal appeal; and, on April 25, 2011, plaintiff commenced this action. (Def.'s 56.1 ¶¶ 12-17; Maloney Aff. ¶¶ 10-18.)

Plaintiff also may not claim that he was unaware of the Fund's appeal procedures or that the Fund failed to adequately notify him of its available administrative remedies. The uncontroverted evidence demonstrates that it was the Fund's practice to send Plan participants a copy of the SPD approximately one month before the start of their eligibility to participate in the Plan. (Def.'s 56.1 ¶ 6.) Additionally, the Fund sent an updated SPD to participants whenever ERISA so required, the latter of which was sent to Fund participants in approximately March 2004, soon after plaintiff became a Fund participant. (*Id.*) Each of the multiple EOBs that the Fund delivered to plaintiff (following submission of his claims) contained a description of the appeals process on the reverse side. (*Id.* ¶ 12.) Plaintiff does not deny receipt of the SPD or EOBs. Plaintiff also offers no argument as to what additional steps the Fund could or should have taken to ensure that plaintiff had notice of its appeal procedures, nor does plaintiff explain why the aforementioned notification procedures were inadequate. Thus, the Court rejects plaintiff's assertion that he had insufficient notice of the Fund's appeal process.

Although plaintiff argues he could not have availed himself of the Fund's administrative remedies because there was no technical denial of his claims, (Stock Affirm. ¶¶ 22-23, 26-27), the Fund's appeals process is not limited to denials of benefits.

11

Rather, it extends to all adverse benefit decisions. (Maloney Aff. Ex. B, at 57-58.) Thus, if plaintiff was not satisfied with the Fund's requirement that participants with third party-caused injuries execute a subrogation agreement before any payment of claims, he could have appealed such a decision by asserting "an adverse decision of a post service claim," a procedure explicitly set forth in the SPD's "Claim Appeal Procedures" section. (*Id.* at 57.) Plaintiff did not do so. Instead, plaintiff's counsel sent two letters (on August 27 and September 14, 2009), each of which was addressed to Maloney Associates (not the Board of Trustees, as required under the SPD's appeal procedures), and each of which simply demanded payment of plaintiff's claim and a threat of legal action (not a request for review or entreaty for an appeal).

Not only is plaintiff unable to show exhaustion of the SPD's available administrative remedies, but he also cannot show that exemption from exhaustion is warranted here. As previously set forth, waiver of the exhaustion requirement is only appropriate where a participant can make a "clear and positive showing" that any appeal – if pursued – would have been pointless. *Kennedy*, 989 F.2d at 594; *see also Quigley*, 2011 WL 1213218, at *8 (stating plaintiffs must exhaust available administrative remedies unless they can show that rejection of any such claim is a "foregone conclusion" (quoting *Saladin v. Prudential Ins. Co. of Am.*, 337 F. App'x 78, 80 (2d Cir. 2009)) (internal quotation marks omitted). Plaintiff does not show, nor does the record suggest, that a pursuit of an appeal here would have been futile. Because Zarringhalam cannot show the frivolousness of pursuing an appeal via the SPD's administrative review process, waiver of the exhaustion requirement is not appropriate in his case.

In sum, plaintiff failed to properly exhaust the administrative remedies available to him under the Plan, and he cannot show that waiver of this requirement is applicable to his case. For these reasons, this Court concludes, based upon the uncontroverted evidence, that Zarringhalam's ERISA-covered denial of benefits claim has not been properly exhausted.[6] *See Leak v. CIGNA Healthcare*, 423 F. App'x 53, 53-54 (2d Cir. 2011). Accordingly, summary judgment is granted to defendant on this ground. Although the Court need not address the merits because the claim is not timely exhausted, the Court, in an abundance of caution, will address them (because exhaustion is no longer possible).[7] The Court finds, in the alternative, that plaintiff's claim fails on the merits.

### C. Trustees' Decision as to Subrogation Provision

Defendant moves for summary judgment on an additional ground. Defendant argues that the Trustees' decision to require execution of a subrogation agreement before making any payments towards a third party-caused injury claim constituted a proper execution of their discretionary authority. Because their decision was neither arbitrary nor capricious, it should remain undisturbed. Plaintiff contends that the Trustees' discretion is not "unbridled," and they should not be able to require more under the Plan than is required under ERISA. (Stock Affirm. ¶ 33.) For the following reasons, this Court agrees with defendant and finds

---

[6] At oral argument, counsel for defendant made clear that exhaustion of the Plan's administrative remedies is no longer available to plaintiff, as he lost that right when he failed to properly exhaust under the Plan and its corresponding time limits.

[7] See *supra* n.6.

12

that plaintiff failed to raise a genuine issue of material fact as to whether the Trustees' denial of payment in the absence of an executed subrogation agreement was arbitrary and capricious.

1. Legal Standard

Courts reviewing a challenge of denial of benefits under ERISA may do so on a motion for summary judgment, which "provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record." *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160(JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007); *see also Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07 Civ. 9661(GEL), 2009 WL 222351, at *12 (S.D.N.Y. Jan. 30, 2009); *Suarto v. Bldg. Servs. 32BJ Pension Fund*, 554 F. Supp. 2d 399, 414-15 (S.D.N.Y. 2008) (collecting cases). Upon such a motion, "the contours guiding the court's disposition . . . are necessarily shaped through the application of the substantive law of ERISA." *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 780 (S.D.N.Y. 1993).

ERISA does not set forth a standard of review for courts to apply when reviewing ERISA plan administrators' decisions concerning the allotment of benefits. The Supreme Court, however, has provided guidance in this area. *See Conkright v. Frommert*, 130 S.Ct. 1640, 1646 (2010) (stating "[i]f the trust document gives the trustee 'power to construe disputed or doubtful terms, . . . the trustee's interpretation will not be disturbed if reasonable.'" (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989))). In reviewing a trustee's denial of plan benefits, Supreme Court precedent makes clear that courts must apply a *de novo* standard "unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (quoting *Firestone*, 489 U.S. at 115). Where the plan does so contrarily provide – for instance, "by granting 'the administrator or fiduciary *discretionary authority* to determine eligibility for benefits,'" *id.* (quoting *Firestone*, 489 U.S. at 115), – then "[t]rust principles make a *deferential standard* of review appropriate." *Id.* (quoting *Firestone*, 489 U.S. at 111).

Where a plan administrator is authorized to discretionarily assess benefit eligibility, a court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995); *see also Cirincione v. Plumbers Local Union No. 200 Pension Fund*, No. 07-cv-2207 (JS)(ARL), 2009 WL 3063056, at *3 (E.D.N.Y. Sept. 24, 2009); *Williams v. Delta Family-Care Disability & Survivorship Plan*, No. 07-cv-5329 (CPS), 2009 WL 57138, at *6 (E.D.N.Y. Jan. 7, 2009). Pursuant to this "highly deferential standard of review," a court "cannot substitute its judgment for that of the Plan Administrator and will not overturn a decision to deny or terminate benefits unless it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fuller v. J.P. Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005) (quoting *Pagan*, 52 F.3d at 441) (internal quotation marks omitted); *see also Novella v. Westchester Cnty.*, 661 F.3d 128, 140 (2d Cir. 2011). If "both the trustees [of an ERISA plan] and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control." *Miles v. N. State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 601 (2d Cir.), *cert. denied*, 464 U.S. 829 (1983).

As may be derived from the applicable

law, the scope of judicial review when applying the arbitrary and capricious standard is narrow. *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003); *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995) ("When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits . . . ."); *Butler v. N.Y. Times Co.*, No. 03 Civ. 5978(RCC), 2007 WL 703928, at *3 (S.D.N.Y. Mar. 7, 2007) ("'Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment.'" (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974))); *see also Greenberg v. Unum Life Ins. Co. of Am.*, No. CV-03-1396 (CPS), 2006 WL 842395, at *8 (E.D.N.Y. Mar. 27, 2006) ("Decisions of the plan administrator are accorded great deference: [t]he court may not upset a reasonable interpretation by the administrator . . . . Accordingly, it is inappropriate in this setting for the trial judge to substitute his judgment for that of the plan administrator." (alteration in original)). In the context of a summary judgment motion, the "arbitrary and capricious standard requires that [the court] ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Williams*, 2009 WL 57138, at *6 (alteration in original) (quoting *Davis v. Commercial Bank of N.Y.*, 275 F. Supp. 2d 418, 425 (S.D.N.Y. 2003)) (internal quotation mark omitted).

The instant case throws an additional factor into the standard-of-review mix, namely, a plan administrator's interpretation of a Plan's subrogation provisions. This Court does not operate in a vacuum of case law on this issue. Courts generally have applied an "arbitrary and capricious" standard of review to such determinations, provided that a plan's written documentation confers discretionary authority onto the administrator to interpret a plan's terms. *See, e.g., Moore v. CapitalCare, Inc.*, 461 F.3d 1, 11-12 (D.C. Cir. 2006) (noting courts have applied an "arbitrary and capricious" standard of review in suits concerning ERISA plan subrogation rights); *Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir. 1997) (holding arbitrary and capricious standard of review applicable to trustees' interpretation of ERISA employee benefit plan where trust authorized trustees to make such eligibility determinations and granted them discretion to interpret ambiguous plan provisions); *accord Wendy's Int'l, Inc. v. Karsko*, 94 F.3d 1010, 1012 (6th Cir. 1996).

Here, the Trust Agreement and the SPD expressly grant the Trustees discretionary authority to determine benefit eligibility and interpret the Plan's documents. As previously set forth, section 4, Article 5 of the Trust Agreement states that the Trustees "shall have complete discretionary authority to interpret and construe all terms and provisions of . . . the Plan . . . including, but not limited to, questions relating to eligibility, [and] entitlement to benefits . . . ." (Maloney Aff. ¶ 4.) Furthermore, the SPD, in a section entitled, "Plan Interpretations and Determinations," provides:

> Notwithstanding any other provision of this Plan, the Board of Trustees is responsible for interpreting the Plan and for making determinations under the Plan. In order to carry out this

14

responsibility, the Trustees shall have exclusive authority and discretion:

- To determine whether an individual is eligible for any benefits under the Plan;
- To determine the amount of benefits, if any, an individual is entitled to from the Plan;
- To determine or find facts that are relevant to any claim for benefits from the Plan;
- To interpret all of the Plan's provisions;
- To interpret all of the provisions of the Summary Plan Description;
- To interpret the provision of any collective bargaining agreement or written participation agreement involving or impacting the Plan;
- To interpret the provisions of the Trust Agreement governing the operation of the Plan;
- To interpret all of the provisions of any other document or instrument involving or impacting the Plan;
- To interpret all of the terms used in this Plan and all of the other previously mentioned agreements, documents and instruments; and
- To amend, modify, or discontinue all or part of the Plan whenever, in their sole and absolute discretion, conditions so warrant.

All such determinations and interpretations made by the Trustees:

- Shall be final and binding upon any individual claiming benefits under the Plan and upon all employees, all employers, the Union, and any party who has executed any agreement with the Welfare Fund Trustees or the Union;
- Shall be given deference in all courts of law to the greatest extent allowed by applicable law; and
- Shall not be overturned or set aside by any court of law unless the court finds that the Trustees, or their designee, acted in an arbitrary and/or capricious manner.

(Maloney Aff. Ex. B, at 59.)

The explicit language of both the Trust Agreement and the SPD establishes that the Trustees hold broad discretion to interpret and apply the Plan's documents, including its subrogation provision. This Court, therefore, will apply the arbitrary and capricious standard in reviewing whether the Trustees' decision regarding the payment of benefits to plaintiff was arbitrary and capricious.

The arbitrary and capricious standard of review will be applied, even though the Fund's Board of Trustees is composed of both Union and contributing employers' appointees, as required by the Taft-Hartley Act. *See Griffin v. N.Y. State Nurses Ass'n Pension Plan & Benefits Fund*, 757 F. Supp. 2d 199, 210-11 (E.D.N.Y. 2010). In other words, the joint administration of a benefit plan by both employer appointees and union appointees creates a conflict of interest of which a court should take notice when conducting its review. *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) (stating "[t]he employer representatives have fiduciary interests that weigh in favor of the trusts' beneficiaries on the one hand, but representational and other interests that weigh to the contrary . . . [and t]hat the board is (by requirement of statute) evenly balanced between union and employer does not negate the conflict"). The weight that the court should afford such a conflict, however, "varies in direct

15

proportion to the 'likelihood that [the conflict] affected the benefits decision.'" *Id.* (quoting *Glenn*, 554 U.S. at 117) (alteration in original); *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 131 (2d Cir. 2008) ("[T]he arbitrary and capricious standard applies unless the [plaintiff] can show not only that a potential conflict of interest exists, . . . but that the conflict affected the reasonableness of the [administrator's] decision." (quoting *Sullivan v. LTV Aerospace & Def. Co.,* 82 F.3d 1251, 1259 (2d Cir.1996)) (second and third alterations in original) (internal quotation marks omitted).

A plaintiff may establish that a noted conflict of interest affected the administrator's decision by one of two paths: (1) showing that the conflict was categorical, *i.e.*, "a history of biased claims administration," *Durakovic*, 609 F.3d at 140 (quoting *Glenn*, 554 U.S. at 117); or (2) case specific, *i.e.*, "an administrator's deceptive or unreasonable conduct," *id*. A court must take either form of conflict into consideration when assessing whether an administrator's decision is arbitrary and capricious. *Id.* A deferential standard of review will remain applicable, even where an administrator is shown to be operating under a conflict of interest. *See Glenn*, 554 U.S. at 115; *see also McCauley*, 551 F.3d at 133 (stating when an administrator both evaluates and pays benefits claims, the court "must take [the conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion, but [the conflict] does not make *de novo* review appropriate").

Here, there is no evidence in the record, nor does the plaintiff direct the Court to such, raising a genuine issue of material fact as to whether the Fund's Board historically made biased decisions, or whether its actions were deceptive, unreasonable, or tainted by a conflict of interest. Moreover, the Board consists of an equal number of both union and employer representatives with the same power and responsibilities, serving to abate any possible conflicts. *See Petri v. Sheet Metal Workers' Nat'l Pension Fund*, No. 07 Civ. 6142 (JGK), 2009 WL 3075868, at *7 (S.D.N.Y. Sept. 28, 2009). The Supreme Court has stated that where there may be a conflict of interest in an administrator's denial of benefits, it should "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Glenn*, 554 U.S. at 117. Thus, because the Court finds no evidence suggesting that a conflict of interest potentially, let alone actually, affected the Board's decision, the Court will review the Trustees' payment decision under the "arbitrary and capricious" standard. *See McCauley*, 551 F.3d at 131.

2. Application

The Fund's Plan expressly excludes coverage where a third party is liable for a participant's alleged injury or illness. (Maloney Aff. ¶ 9; Maloney Aff. Ex. B.) The SPD specifically states, in its "Subrogation/Reimbursement Claims Involving Third-Party Liability" section, that "[u]nder the terms of the Plan, no benefits are payable if a third party may be liable for your medical expenses." (Maloney Aff. Ex. B, at 69.) It goes on to provide:

> If you incur covered expenses for which a third party may be liable, or if you become entitled to other benefits as a result of the same events which caused you to incur the covered expenses, you are required to advise the Plan of that fact.

The Plan may pay such expenses provided that you agree, in writing, to reimburse the Plan, in full, from any settlement, judgement, [sic] or other payment that you obtain from the liable third party.

. . . .

The Trustees will require you (or your authorized representative if you are a minor or incapacitated) to execute this Plan's lien forms before this Plan pays you any benefits related to such expenses.

No benefits will be provided unless you and your attorney (if any) sign the form.

(*Id.* at 69-70.)

Undaunted by the SPD's clear language as to subrogation execution for third party-caused injuries, plaintiff argues that the Fund cannot require him to sign any such reimbursement agreement because ERISA does not require as such. The Court disagrees.

ERISA "does not regulate the substantive content of welfare benefit plans." *Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985); *see also United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir. 1998) (stating ERISA "does not mandate any minimum substantive content for [employee welfare benefit] plans"). As a result, "employers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003).

Although ERISA does not "require[] a welfare plan to contain a subrogation clause[,]" it also notably does not "bar such clauses or otherwise regulate their content." *Ryan by Capria-Ryan v. Fed. Express Corp.*, 78 F.3d 123, 127 (3d Cir. 1996). Thus, plaintiff's argument that ERISA's silence as to subrogation should be equated with prohibition of the same is without merit. *See Manginaro v. Welfare Fund of Local 771, I.A.T.S.E.*, 21 F. Supp. 2d 284, 306 (S.D.N.Y. 1998) (noting that ERISA neither mandates nor prohibits the inclusion of subrogation clauses in welfare benefit plans); *Preze*, 1992 WL 38398, at *4 ("Since ERISA does not expressly prohibit subrogation, we must assume Congress intended to allow it.").

It is common for ERISA-covered employee welfare benefit plans to include subrogation provisions. *See*, *e.g.*, *Kress v. Food Empl'rs Labor Relations Ass'n*, 391 F.3d 563, 569 (4th Cir. 2004) (citing Amber M. Anstine, Comment, *ERISA Qualified Subrogation Liens: Should They Be Reduced to Reflect a Pro Rata Share of Attorney Fees?*, 104 Dick. L. Rev. 359, 360 (2000)); *see also Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1236-38 (11th Cir. 2010); *Waller v. Hormel Foods Corp.*, 120 F.3d 138, 140 (8th Cir. 1997) (noting that "ERISA leaves [the] issue [of subrogation provisions] to the private parties creating the plan"); *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1298 (7th Cir. 1993) ("[I]t is not surprising that subrogation clauses are a common feature of insurance policies."); *Schwade v. Total Plastics, Inc.*, 837 F. Supp. 2d 1255, 1264 (M.D. Fla. Nov. 10, 2011) ("Unsurprisingly, many ERISA benefit plans include a sweeping grant of subrogation . . . . A subrogation provision in a plan summary is, in a word, standard." (internal citations omitted)).

Not only do ERISA-covered employee welfare benefit plans commonly include subrogation provisions, but courts consistently have recognized as reasonable plan administrators' decisions to require

17

execution of subrogation agreements as a condition for the payment of benefits. *See Kress*, 391 F.3d at 568; *Ryan*, 78 F.3d at 127-28 ("[I]t would be inequitable to permit the [plaintiffs] to partake of the benefits of the Plan and then, after they had received a substantial settlement, invoke common law principles to establish a legal justification for their refusal to satisfy their end of the bargain."). Indeed, the Eleventh Circuit articulately summed up the rationales supporting a Fund's requirement of such subrogation execution pre-payment of benefits, and the risks to which the Fund might expose itself were it not to require execution of such:

> When we consider the practical reasons for requiring the subrogation agreement to be signed before paying any benefits, the reasonableness of that policy becomes abundantly clear. The Fund uses the subrogation agreements in negotiations with at-fault third parties. Once benefits are paid, participants and beneficiaries have little incentive (other than the fear of a lawsuit) to sign a subrogation agreement. If the Fund cannot require the agreement beforehand, it often will have to resort to lawsuits or at least the threat of lawsuits to obtain the agreements. Lawsuits cost money, sometimes a lot of it. In addition, delay becomes inevitable, and while the Fund is attempting to obtain the agreements from participants and beneficiaries, the Fund is hampered in its negotiations with at-fault third parties. In short, having the agreement in hand before paying benefits provides significant protection to trust assets.

*Cagle*, 112 F.3d at 1520. The Court finds the *Cagle* analysis to be persuasive.

In short, nothing under ERISA or established case law prevents or forbids the Fund from requiring the signing of a subrogation agreement as a condition for paying benefits. Having considered the legitimacy of the subrogation agreement itself, the Court analyzes the Fund's interpretation of this requirement.

The record shows that plaintiff submitted claims for injuries purportedly incurred from plaintiff's tripping on a "raised sidewalk flag." (Maloney Aff. Ex. G.) Significantly, plaintiff does not dispute that his injuries stemmed from a third party's actions. (*See* Def.'s 56.1 ¶ 18.) Thus, the Fund's determination that a third party might be liable for plaintiff's asserted injuries (for instance, the entity responsible for maintaining the sidewalk or placing the flag therein) was not arbitrary or capricious.

The SPD's language is clear: while plaintiff is, by virtue of his status as a Plan participant, entitled to payment for *covered* medical expenses, injuries for which a third party holds liability are specifically excluded from those expenses for which the Fund may distribute benefits. (Maloney Aff. Ex. B, at 69.) The SPD expressly states that it conditions payment for third party-caused injuries on a participant's execution of a subrogation agreement. (*Id*.) The evidence shows that the Fund informed plaintiff it would withhold payment of benefits pending plaintiff's execution of the subrogation agreement, and that Zarringhalam refused to execute such an agreement. The Fund's decision to condition payment of plaintiff's medical expenses on his executing a subrogation agreement, therefore, was not a *breach* of the Plan, but a *requirement* of it. *See Burnham v. Guardian Life Ins. Co. of Am*., 873 F.2d 486, 489 (1st Cir. 1989) ("[S]traightforward language in an ERISA-regulated insurance policy should be given

18

its natural meaning."); *Borden v. Blue Cross & Blue Shield of W. N.Y.*, 418 F. Supp. 2d 266, 273 (W.D.N.Y. 2006) ("[W]here an ERISA plan's language sets out plain and unambiguous terms for subrogation and reimbursement, those terms must be enforced as written." (quoting *Franks v. Prudential Health Care Plan, Inc.*, 164 F. Supp. 2d 865, 880 (W.D. Tex. 2001)). For these reasons, the Fund's determination to withhold the payment of benefits to plaintiff was neither arbitrary nor capricious.

## V. Conclusion

For the reasons set forth herein, the Court grants defendant's motion for summary judgment in full, denies plaintiff's cross-motion for summary judgment in its entirety, and dismisses plaintiff's Complaint. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: November 30, 2012
      Central Islip, New York

\* \* \*

The attorney for plaintiff is Thomas J. Stock of Thomas J. Stock & Associates, 88 Second Street, Mineola, NY 11501. The attorneys for defendant are Judith P. Broach and Michael H. Isaac of Broach & Stulberg LLP, One Penn Plaza, Suite 2016, New York, NY 10119.